Ashburn, J.
We reverse the judgment of the court below, on the ground that the verdict was not sustained by the evidence, and should have been set aside upon the motion for a new trial.
Defendant in error, Mary Valleley administratrix, brought suit against the railroad company, to recover for the death of her brother, John Valleley, killed by the cars, as is supposed. Deceased -was unmarried, and left a mother and sisters, for whose benefit this suit was brought. On the 6th September, 1870, John Valleley took passage in cars of the defendant, at Alliance, to go to Canton. He was a young man, less than twenty-one years of age. Before he took the train, and during the afternoon, he had been drinking considerably. He went into a saloon at Alliance, and called for a drink. The saloon-keeper refused to give him any, saying that he had drunk enough. In the saloon, William Reynolds and Dr. Smith were sitting, and deceased insisted on having a fight with one or both of them; not for any assignable cause or provocation, save that quarrelsome disposition which liquor sometimes infuses.
Dr. Smith was a stranger, but Valleley wanted to whip *348 him, and the doctor describes the man as being “ not very drunk, but ugly, fighting drunk.”
At Alliance, he hired a horse and buggy, and took a drive. Upon coming back to the livery stable the owner claimed that the horse had been driven too hard, and that the consequences might be serious. Upon this Yalleley, in his slang phrase, wanted to “lick him.”
He took the cars about dusk. On the train he created serious disturbance. A witness describes him as on the platform between the cars, and swinging himsélf off, holding on to the iron railing, and out beyond the line of the train, in such a position that striking any object would probably have killed him. A brakeman interfered, and tried to pull him back to a place of safety. This occurred more than once, and there was a violent struggle between the brakeman and deceased, in the course of which they got inside the car. They struggled together over the seats. There was a scene of great confusion. Ladies endeavored to get away by climbing over the backs of the seats. The passengers interfered, and separated the combatants, and told the brakeman to go outside the car, as deceased appeared to have a violent antipathy against him. The brakeman complied, but coming back to get his hat, deceased jumped at him again. They clinched and went down upon a seat, where were a lady and child, and, as a passenger states it, “I thought they would mash the child.” Deceased was said to have been brandishing a knife, which he dropped upon the floor, and was hunting about to find. Passengers again interfered, and got the brakeman out upon the platform once more, shut and locked the door. Deceased tried to open it, and failing, began an assault upon one of the passengers.
The conductor came along about this time, and the passengers were clamoi-ous to have the rowdy put off". The conductor stepped up to him, and deceased threatened to shoot him. The train, however, was stopped, and the man expelled. No barm was done him in this. No violence was used, and only force enough to accomplish the end.
*349 Deceased was put off about eight or nine o’clock in the evening. The next morning he was found, about one-third of a mile from where he was put off, nearly dead, and in fact lived but a few moments after he was picked up. Though there is no direct testimony as to how he was killed, yet, as he was found near the track, badly bruised and mangled, it is assumed that he was run over and killed by another of the company’s trains ; and, for the purposes of this decision, that assumption may be regarded as the correct one.
Upon the first trial, the claim was that deceased was but slightly intoxicated, and so slightly that the company had no right to put him off. Upon this, the jury found for defendant. Whereupon, the petition was amended, and the case tried upon the theory that deceased was so much intoxicated that the company had no right to expel him ; that he was so very drunk as to be stupid, helpless,- and unable to take care of himself; and putting him off near the track, where he was likely to be run over, and was run over, the company was responsible, aud upon this a verdict of $600 was recovered.
It might, perhaps, as far as this case is concerned, be conceded that if a man were so intoxicated as to be without reason, sense, or intelligence, it would be unlawful, as it would be inhuman, to expel him from cars at night, where he would be just as likely as not to lie down upon the rails and go to sleep. We may concede further, that to put off a drunken man, during a bitterly cold night, in the woods, far from any house, when the probabilities were that he would freeze to death before help could reach him, would be as indefensibie in law as it would be wicked and cruel in fact. And, further, to put a man off, in a dark night, upon a high railroad bridge, or upon the brink of a precipice, where the first step would be destruction — this could find no justification in law. All this might possibly be. We suppose that the principles governing cases of this kind are not different from those which control the ordinary affairs of mankind. Rights and powers must be *350 reasonably exercised, under all circumstances of tbe ease. The conductor of a railroad train must use his best judgment and discretion. If he acts, not wantonly, not abusively, but with that prudence which the case demands, his employer can not be made responsible.
It is claimed that this man was so drunk as to be bereft of all intelligence, and that tbe conductor ought to have known that putting him off was equivalent to putting him to death ; that such was his condition, that expelling him, as was done, nothing was more likely than that he would wander along the track, and be killed, as he was, and therefore the death was the natural and proximate result of the expulsion. The flaw in this claim is, that it is not true that deceased was so drunk as to be bereft of intelligence. He was ugly, “ fighting drunk,” vicious, and illustrating the qualities of a reckless desperado, but he had quite sense enough to take care of himself. That there was no paralysis of his physical faculties is evident from the manner in which he handled the brakeman ; and although all the witnesses recognized the fact of his intoxication, not one of them supposed that he was unable to take care of himself. Those who speak of it all say the reverse.
The man, therefore, was- not helpless, nor stupid, and the conductor had no reason to think so. That it was not only his right, but his duty, under these circumstances, to 'put off a man furiously drunk, who, in a crowded car, with women and children, is fighting, flourishing a knife, and threatening to shoot, is evident upon the plainest principles of self-defense, if nothing else.
But, if the propriety of the expulsion were doubtful, either because deceased’s conduct did not justify it, or because his condition rendered it unsafe and dangex’ous in its consequences, still we must find that the death was the natural and proximate cause of the expulsion befox’e defendants can be made liable. How can this be said in the present case ? Admit that the vicinity of a railroad track is dangerous to passers by; admit that putting him off, as was done, was placing him in eii’cumstances of danger: *351 they were no more dangerous to him than they were to every man whose business or pleasure takes him in the neighborhood of railroads. There was no unusual or extraordinary circumstance of danger in the whole transaction, if the man was able to take care of himself, and this he wTas. The mere putting him off, therefore, was in no way connected with his death, except as he himself connected it, by reason of his intoxication, and for this he alone is responsible. The expulsion is not in any way the occasion of the catastrophe, either as a proximate or other cause, unless it is in some way attached to or linked with the drunkenness. If this is the state of the case, he must have been so drunk at the time be was struck as to be unable to avoid the accident, which shows the intoxication to have been the proximate cause; and whether it be the proximate cause, or a cause for which alone he is responsible, in either case, the responsibility can not be fastened upon the defendant.
At what particular hour of the night or following morning he was run over, the evidence leaves in doubt. It has been said, and it is clearly shown by the record, that when he was so expelled he was not so drunk as to be in any sense incapable. What occurred between this time and when he was picked up in a dying condition can not be known. If, during this period, he lapsed into insensibility or incapacity for self-protection, it must be from some reason not apparent in the testimony. Whether he obtained more liquor, or whether a drunken stupor came upon him, such as arises in the last stages of inebriety, no one can tell. It is sufficient to say that, in our opinion, he was not in that condition that relieved the conductor from the imperative necessity of doing as he did, and this we can not consider as in any way being the cause of the death. O'Keefe, Adm’x, v. C., R. I. & P. R. R., 32 Iowa, 457; Haley, Adm’r v. C. & N. W. R. R., 21 Iowa, 15; Vinton v. Middlesex R. R., 11 Allen, 304.

Judgment reversed.

Scott, J., being absent, did not sit in the ease.